1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT FOR THE

6                  EASTERN DISTRICT OF CALIFORNIA

7
8    AMYRA NICHOLSON, C.W. a minor by )      1:08-CV-1168  AWI SKO
     her guardian ad litem Amyra Nicholson, )
9    R.S.W. a minor by his guardian ad litem )
     Amyra Nicholson, and BRITTANY     )      ORDER ON DEFENDANTS'
10   WILLIAMS,                         )      MOTION FOR SUMMARY
                                       )      JUDGMENT
11                 Plaintiffs,         )
          v.                           )
12                                     )      (Doc. No. 51)
     CITY OF BAKERSFIELD, et al.,      )
13                                     )
                   Defendants.         )
14   _____ )

15
16
17         This civil rights lawsuit arises from the search of various individuals, including minors,

18   who were present during the search of a person who was on parole.  The active complaint is the

19   Third Amended Complaint.  Plaintiffs allege state law claims for assault, battery, false

20   imprisonment, and intentional infliction of emotional distress,[1] and federal claims under 42

21   U.S.C. § 1983 for violation of the Fourth Amendment (unreasonable search and seizure and

22   excessive force) and *Monell* liability.  Defendants now move for summary judgment.  For the

23   reasons that follow, Defendants' motion will be granted in part and denied in part.

24                            **FACTUAL BACKGROUND**[2]

25         On June 29, 2008, members of the City of Bakersfield ("the City") police department and

26
27   _____

28         [1]The State law claims are brought only by Plaintiffs C.W. and R.S.W.

          [2]"DUMF" refers to "Defendants' Undisputed Material Fact," "PUMF" refers to "Plaintiffs' Undisputed
     Material Fact," and "PRDUMF" refers to "Plaintiffs' Response to Defendants' Undisputed Material Facts."

the Kern Narcotics Enforcement Team ("KNET") went to 3204 Cornell Street in Bakersfield,

California for the purpose of conducting a parole search. See DUMF 1. Defendant Richard

Dossey ("Dossey") received information that Plaintiff Amyra Nicholson ("Nicholson") was

selling narcotics from a business establishment.[3] See PRDUMF 1. Dossey discovered during his

investigation of this tip that Marcus Miles ("Miles") lived at 3204 Cornell and was on parole.

See id. Miles was on parole for violation of Penal Code § 4573.8 (bringing illegal narcotics into

a jail), and had been on parole for violation of Penal Code § 12021(a)(1) (felon in possession of a

firearm). See DUMF 2. Miles was also a documented member of a criminal street gang. See

DUMF 3. Dossey did not consider obtaining a search warrant in relation to the allegation that

Nicholson was selling drugs. See PRDUMF 1.

Police officers arrived in the neighborhood and parked their cars in such a manner as to

not alert anyone at 3204 Cornell of their presence. See DUMF 4. Dossey, who was followed by

other officers to assist him, approached 3204 Cornell and observed a male lying on the ground

underneath the front end of a brown car that was parked in front of the residence. See DUMF's

5, 7. Dossey also observed a white car and a pickup truck in front of the residence, and observed

a male and female standing about one foot from one another and leaning against the bed of the

truck. See DUMF 6. When they were within 20 feet of the truck, Dossey recognized that the

male leaning against the truck was Miles, based on photos that Dossey had seen. See DUMF 8.

Dossey also recognized the female as Nicholson from photos he had seen, and later confirmed

that the female was Nicholson. See DUMF 9; PRDUMF 9. As the officers approached,

Nicholson's purse was on her shoulder. See PRDUMF 10.[4]

---

[3] Dossey contends that he received a confidential tip that narcotics were being sold from 3204 Cornell. See DUMF 1. In opposition, Plaintiffs cited to Dossey's deposition testimony. Those citations indicate that the tip related to Nicholson selling drugs from the Tropicana; the tip did not relate to Miles or to drugs being sold at 3204 Cornell. See PRDUMF 1. Because Plaintiffs are the non-moving party, the Court views the evidence in the light most favorable to them and credits their version of events when the facts are disputed. See Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). Accordingly, for purposes of this motion, the Court follows Plaintiffs' version of the confidential tip.

[4] Defendants contend that Nicholson reached into the bed of the truck, grabbed the purse, and put the purse on her shoulder. See DUMF 10. However, Nicholson's deposition testimony states that she was already wearing the purse. See Nicholson Depo. 49:21-23. Since this is summary judgment, Plaintiff's version of events is credited. See Stegall, 350 F.3d at 1065.

1    Officer Ursery made contact with Miles and placed him in handcuffs for the safety of the

2    officers.  See DUMF 11.  Dossey detained Nicholson at the scene as officers ordered her to "stop,

3    freeze."  PRDUMF 12.  Dossey and Nicholson walked over to the neighbors yard, and Dossey

4    instructed Nicholson to sit down on the curb.  See Nicholson Depo. 50:12-23.  Nicholson

5    initially refused to sit down because the curb was wet and muddy.  See id. at 50:23-51:5.  Dossey

6    told Nicholson that she did not have a choice, and that if she refused, he would take her to jail

7    and have Child Protective Services take her children.  See id. at 51:6-17.  In response, Nicholson

8    sat down.  See id.  Dossey then told Nicholson that he needed to search her purse, but Nicholson

9    refused.  See id. at 53:19-21.  Dossey said that he needed to search the purse for weapons, but

10   Nicholson again refused and said that she had no weapons.  See id. at 52:21-53:1; see also

11   DUMF 54.  Dossey declared and testified that he was concerned that Nicholson had some type of

12   weapon or contraband in her purse.[5]  See DUMF 15.  Dossey then spoke to another officer,[6]

13   walked back to Nicholson, leaned down, and told Nicholson that a female officer would be

14   arriving and that everyone was going to be searched, the purse was going to be searched, and

15   Nicholson's children were going to be searched.  See Nicholson Depo. 54:1-12.  Nicholson said

16   that Dossey could not do that, but as she was protesting, Dossey shoved Nicholson.  See id. at

17   54:13-16.  As Dossey shoved and knocked Nicholson back into the grass and mud, he snatched

18   Nicholson's purse from her.  See id. at 54:18-55:6.  Once Dossey had taken control of the purse,

19   he negated any concerns that he had regarding officer safety in relation to weapons in the purse.

20   See Suppression Hearing Transcript 23:21-24:4.  Dossey then took the purse and walked back

21   over to the yard at 3204 Cornell.  See Nicholson Depo. at 62:14-15.  Dossey opened the purse,

22   emptied the purse upside down, and shook the purse so that the contents of the purse fell to the

23   yard.  See id. at 62:17-22.  Dossey found inter alia a black cell phone, a blue notebook with "pay

24   and owe" items, one plastic bag that contained numerous 1" x 1" plastic bags with an "S" logo on

25   _____

26       [5]Based on experience and training, Dossey knew that people who deal in narcotics will often be armed to
     protect themselves and their narcotics.  See DUMF 13.  Dossey also was aware that individuals who deal in narcotics

27   will often have females conceal weapons on their person or in their purses because they feel police officers are less
     likely to search a female or her purse for weapons.  See DUMF 14.

28       [6]Plaintiffs have not identified who this other office was.

3

the side, two razors, $300, and a clear plastic bindle with a white powder believed to be methamphetamine.  See PRDUMF's 18, 23.  Dossey picked up the bag of methamphetamine and said, "this is what I was looking for."  See Nicholson Depo. 63:1-13.[7]

As other officers approached the front of 3204 Cornell, several young people (i.e. Plaintiffs Brittany Williams ("Williams") and R.S.W.) exited the residence, and were later identified as Nicholson's children.  See DUMF 21; PRDUMF 21.  Plaintiff C.W. was inside the home asleep, but at some point came outside and was placed with the Williams and R.S.W.  The names and ages of the children were obtained, but they were not handcuffed at any time.  See DUMF 22; PRDUMF 22.  Officers were watching over the children to ensure that the children would not leave.  See Dossey Depo. 32:8-11; Pflugh Depo. 33:11-34:10.

Dossey then confirmed with Miles that he was residing at 3204 Cornell, and directed the other officers to conduct a parole search of the residence.  See DUMF 24.  Miles was in fact on parole at the time of the search, and one of Miles's parole conditions was that he was subject to search without a warrant.  See DUMF 50.  Nicholson was married to Miles at the time of the search, and all of the Plaintiffs were residing with Miles at 3204 Cornell.  See DUMF's 51, 52.

At some point, Officer Lynn Martinez ("Martinez") arrived at the scene.  A sergeant had radioed for a female officer to respond to the scene.  See PUMF 13.  When Martinez arrived, it appeared to her that Dossey was "more or less in charge of what was going on, so he directed [her] as to what he needed [her] to do."  Martinez Depo. 24:1-6.  Dossey directed Martinez to conduct a search of Nicholson, and directed her to the other females that were present.  See id. at 29:13-18.  Martinez testified that Dossey requested that she conduct "a search of a - - a patdown search of Amyra Nicholson."  Id.  Martinez testified that she had very little recollection of the events in question, she recalls conducting at least one other search, but cannot recall any specifics such as where the searches were performed.  See id. at 36:7-38:14.  Martinez did testify, however, that she did not remove Nicholson's clothing.  See id. at 41:10-22.

---

[7]Defendants' version of the events surrounding the search of Nicholson's purse is significantly different from Nicholson's version of events.  However, because this is summary judgment, Nicholson's version of events must be credited.  See Stegall, 350 F.3d at 1065.

Nicholson testified that a female police officer took her inside the house and inside the bathroom.  See Nicholson Depo. 75:3-4.  In the bathroom, the officer turned Nicholson around, spread Nicholson's legs apart, pushed Nicholson's head slightly forward, and then raised Nicholson's shirt up.  See id. at 75:5-12.  Nicholson said that she did not have underclothes on, but the officer continued to raise Nicholson's shirt.  See id. at 75:12-19.  Nicholson told the officer that the officer could not "do that," and the officer replied that this had nothing to do with her (the officer), that the officer was called out to do a search and that she was doing what she was called out to do.  See id. 75:20-76:1.  Nicholson protested that there was a hospital down the street that they could go to, and that the officer could not take Nicholson's clothes off.  See id. at 76:1-4.  The officer replied that Nicholson had to be searched, that the officer was called out to search, and that everyone was being searched.  See id. at 76:5-7.  The officer then raised Nicholson's shirt and felt underneath Nicholson's breasts.  See id. at 76:8-17.  The officer then pulled Nicholson's shorts down, which caused Nicholson to start to cry.  See id. 76:17-24.  The officer then searched around Nicholson's waist, buttocks, and vaginal areas, and then pulled Nicholson's pants back up and took her outside.  See id. at 76:25-77:11.

Brittany Williams's testimony was similar to Nicholson's testimony.  Williams testified that a female police officer grabbed Williams and said that she had to search.  See Williams Deposition at 30:21-22.  The officer took Williams inside the house and into the bathroom.  See id. at 32:6-11.  The officer shut the door and put on gloves.  See id. at 32:18-20.  The officer patted down Williams.  See id. at 33:2-4.  The officer then stuck her hand inside Williams's bra and rubbed across Williams's chest.  See id. at 33:8-9.  The officer then patted Williams's pockets and then tugged Williams's pants and underwear down.  See id. at 33:18-34:5.  The officer ran her hand from the rectal to the vaginal areas of Williams.  See id. at 34:6-8.  The officer then told Williams that Williams could pull up her pants, asked Williams how far along in the pregnancy she was, and then walked her outside.  See id. at 34:16-22.  Williams testified that the officer went back inside the house with C.W. between two and five minutes after having exited the house with Williams.  See id. at 35:1-16.

C.W. testified that she had to use the restroom and that the female officer went inside

with her. See C.W. Depo. 44:10-15. C.W. believed that someone had told the officer that she needed to use the restroom and that the officer was taking her inside to use the restroom. See id. at 44:16-45:2. C.W. and the female officer went into the house and into the restroom together. See id. at 46:1-15, 47:9-11. The female officer stood about a foot away from C.W., and told C.W. to completely undress and not to flush. See id. at 47:21-48:11, 50:15-16. C.W. used the restroom and removed all of her clothing, including her bra and underwear. See id. at 47:24-49:11. The female officer searched C.W.'s clothes, but never touched C.W. See id. at 49:25-50:12. The female officer asked C.W. to spin around. See id. at 50:13-16. The female officer later checked the toilet, flushed the toilet, told C.W. to get dressed, and then C.W. and the officer went back outside. See id. at 50:23-51:20.

R.S.W. testified that Williams had told the female officer that R.S.W. needed to use the restroom. See R.S.W. Depo. at 34:16-19. R.S.W. told the officer that he needed to use the restroom, and the officer responded that she would take R.S.W. to the house. See id. at 34:20-35:5. R.S.W. had seen the female officer take Nicholson, Williams, and C.W. into the house. See id. at 35:9-21. R.S.W. and the female officer went into the house, and the female officer told R.S.W. to wait outside of the bathroom door. See id. at 38:16-19. The female officer then called a male officer over.[8] See id. at 38:21-22. The female officer told the male officer to watch R.S.W. use the restroom. See id. at 39:5-9. The male officer and R.S.W. went into the restroom, and the male officer told R.S.W. to give him all of his (R.S.W.'s) clothes and for R.S.W. to turn around in a circle. See id. at 39:15-23. R.S.W. used the restroom and then took off all of his clothes and turned around in a circle. See id. at 40:20-41:13, 42:10-14. The male officer never physically touched R.S.W. See id. at 41:14-15. After R.S.W. had turned around, the male officer looked at R.S.W.'s clothes  and then gave the clothes back to R.S.W. See id. at 41:21-42:14. R.S.W. put on his clothes, and the male officer called the female officer back to the restroom. See id. at 42:15-18. The female officer returned to the restroom and then took R.S.W. back outside to his family. See id. at 42: 25-43:1.

---

[8]None of the named Defendants searched or had any contact with R.S.W., and R.S.W. admits that he has not identified any of the named Defendants as the particular male officer in question. See DUMF's 58, 64; PRDUMF 58.

1    Dossey was the case agent for the search of the residence.  See DUMF 39; PUMF 1.  As

2    case agent, it was Dossey's duty to establish protocols for the search, to obtain all the background

3    information for the location where the search would be conducted, to assign officers particular

4    duties during the search, to conduct a briefing prior to the search, and to accomplish a majority of

5    the reports involved in the case.  PUMF 2.  Officers Slayton, Ursery, and Martin searched the

6    residence.  See  DUMF's 32, 41, 43.  In the course of searching the residence and the vehicles in

7    front of the residence, officers found plastic baggies in a bedroom, drugs, a cell phone, and about

8    $2,000.00.  See DUMF 47.  Based on the items discovered in the residence and in the search of

9    the purse, Dossey believed that Nicholson possessed methamphetamine for purposes of sales.

10   See DUMF 48.  Dossey did not believe that any of the "kids" at the front of the house presented

11   any threat to either him or the other officers, and he also had no reason to believe that the "kids"

12   were harboring contraband.  See Dossey Depo. 45:25-46:7.

13   Sgt. Matt Pflugh ("Pflugh") was a sergeant for the KNET team.  See Pflugh Depo. 14:6-

14   22.  Pflugh's duties in general were to supervise the individuals who were assigned to the KNET

15   team, which of course required that he know what the individual members of KNET were doing.

16   See id.  Pflugh also had the responsibility to approve search warrants, approve arrests, and to

17   supervise officers whenever he and the other officers were out on a KNET function.  See id. at

18   16:4-6.  Pflugh did not direct Martinez to search Nicholson.  See id. at 35:6-8.  While Pflugh was

19   standing in the residence's front yard, he saw Martinez take Nicholson into the house.  See id. at

20   35:9-14.  Pflugh understood that Martinez was going to search Nicholson.[9]  See id. at 35:15-17.

21   Pflugh testified that, in June 2008, the pertinent policy and procedure on strip searches required

22   Pflugh to authorize a strip search in writing.  See id. at 35:18-23.

23

24                          **SUMMARY JUDGMENT FRAMEWORK**

25   Summary judgment is appropriate when it is demonstrated that there exists no genuine

26   issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

27

28   _____

[9]Pflugh did not testify as to what type of search he believed was going to occur.  His testimony is simply
that he believed that Nicholson was going to be "searched."  See Pflugh Depo. at 35:15-17.

7

1  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

2  American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

3  judgment bears the initial burden of informing the court of the basis for its motion and of

4  identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an

5  absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

6  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

7  might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby,

8  Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).

9  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to

10  return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v.

11  Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

12          Where the moving party will have the burden of proof on an issue at trial, the movant

13  must affirmatively demonstrate that no reasonable trier of fact could find other than for the

14  movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of

15  proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential

16  element of the non-moving party's claim or by merely pointing out that there is an absence of

17  evidence to support an essential element of the non-moving party's claim.  See James River Ins.

18  Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire

19  & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party fails

20  to carry its burden of production, then "the non-moving party has no obligation to produce

21  anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan

22  Fire, 210 F.3d at 1102-03.  If the moving party meets its initial burden, the burden then shifts to

23  the opposing party to establish that a genuine issue as to any material fact actually exists.  See

24  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210

25  F.3d 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its]

26  pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a

27  genuine issue for trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir.

28  2008) (quoting Fed. R. Civ. Pro. 56(e)).

The opposing party's evidence is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.  See Simmons v. Navajo County, 609 F.3d 1011, 1017 (9th Cir. 2010); Gordon v. Virtumundo, Inc., 573 F.3d 1040, 1058 (9th Cir. 2009); Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  Nissan Fire, 210 F.3d at 1103.

## DEFENDANTS' MOTION

**I.       7 Bakersfield Police Officers**

Defendants Ryan Slayton, Kyle Ursery, Joseph Cooley, Jeffrey Martin, Ronnie Dulan, Joshua Finney, and Scott Tunicliffe all maintain that they did not search or touch any of the Plaintiffs.  See DUMF's 25-33, 36-38, 41-45.  Plaintiffs agree and state that all but Joseph

Cooley ("Cooley") should be dismissed.  See Opposition at 1:25-2:5.  In light of Plaintiffs'

concession and the evidence produced, see DUMF's 25-33, 41-45, the Court will grant summary

judgment in favor of Defendants Ryan Slayton, Kyle Ursery, Jeffrey Martin, Ronnie Dulan,

Joshua Finney, and Scott Tunicliffe.

Plaintiffs' omission of Cooley from the agreed dismissal appears to be an oversight

because Cooley is never mentioned in Plaintiffs' opposition.  Moreover, Plaintiffs admit that: (1)

Cooley detained Michael Holmes (the individual who was working on the vehicle in front of the

residence); and (2) Cooley did not search inside of the home and did not interact in any way with

Nicholson, Williams, C.W., or R.S.W.  See PRDUMF 36-38.  Plaintiffs have shown no basis for

holding Cooley liable.  In essence, Plaintiffs agree that Cooley did not violate any Fourth

Amendment rights, and did not assault, batter, falsely imprison, or inflict emotion distress upon

them.  Therefore, summary judgment in favor of Cooley on all claims alleged against him is

appropriate.  See PRDUMF 36-38; Motley v. Parks, 432 F.3d 1072, 1082 (9th Cir. 2005).

## II.      Fourth Amendment – Search of Nicholson's Purse

### Defendants' Argument[10]

Dossey argues that Nicholson was in possession of her purse when the officers were

approached her and Miles.  Dossey was concerned that Nicholson might have had a weapon

inside her purse which could be used to harm him and the other officers.  Gang members often

possess and conceal weapons and will use women and children in furtherance of this practice.

Nicholson had a lowered expectation of privacy because she lived with a parolee.  Since Miles

was subject to parole searches, and Dossey reasonably suspected that Miles had hidden a weapon

or contraband in Nicholson's purse, Dossey could search the purse.  Thus, the search of the purse

was reasonable in light of the circumstances.

### Plaintiffs' Opposition

Nicholson argues that Dossey is relying on the ability to conduct a parole search of Miles

---

[10]In the alternative, Dossey moves for qualified immunity  The Court will address qualified immunity in a separate section of the order.

1  and Nicholson's proximity to Miles to justify the search of the purse.  However, it is well

2  established that propinquity alone does not create probable cause.  A mere marriage relationship

3  and physical proximity did not provide probable cause to search the purse or to detain any of the

4  Plaintiffs.  Further, any safety concerns that Dossey may have had about the purse were

5  completely negated when he took control of the purse.  The search and the detention were

6  unreasonable.

7      *Legal Standard*

8      The Fourth Amendment protects the "right of the people to be secure in their persons,

9  houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

10  "A person has an expectation of privacy in his or her private, closed containers," United States v.

11  Davis, 332 F.3d 1163, 1167 (9th Cir. 2003), and "a purse is a type of container in which a person

12  possesses the highest expectations of privacy."  United States v. Welch, 4 F.3d 761, 764 (9th Cir.

13  1993).  "In the ordinary case, the [Supreme] Court has viewed a seizure of personal property as

14  *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished

15  pursuant to a judicial warrant . . . ."  United States v. Place, 462 U.S. 696, 701 (U.S. 1983).  That

16  is, the Fourth Amendment "generally requires that police officers obtain a search warrant before

17  searching a suspect's person or property."  United States v. Morgan, 799 F.2d 467, 468-69 (9th

18  Cir. 1986).  While warrantless searches are generally *per se* unreasonable, there are "a few

19  specifically established and well delineated exceptions."  Katz v. United States, 389 U.S. 347,

20  357 (1967).  "Where law enforcement authorities have probable cause to believe that a container

21  holds contraband or evidence of a crime, but have not secured a warrant, the [Supreme] Court

22  has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a

23  warrant to examine its contents, if the exigencies of the circumstances demand it or some other

24  recognized exception to the warrant requirement is present."  Place, 462 U.S. at 701.

25      Pursuant to *Terry v. Ohio*, when an officer has "reasonable suspicion" that a person who

26  is lawfully detained is carrying a weapon, including a weapon in a personal container such as a

27  purse, then the officer may conduct a pat down search or a limited search for weapons.  See

28  United States v. Orman, 486 F.3d 1170, 1173-74 (9th Cir. 2007); United States v. Flippin, 924

F.2d 163, 165-167 (9th Cir. 1991).  Reasonable suspicion is present when "a reasonably prudent

man in the circumstances would be warranted in the belief that his safety or that of others was in

danger." Terry v. Ohio, 392 U.S. 1, 27 (1968); Orman, 486 F.3d at 1176.  Reasonable suspicion

is an objective inquiry, see Orman, 486 F.3d at 1176, and is "based on specific and articulable

facts." Flippin, 924 F.2d at 166.  Numerous factors may establish reasonable suspicion,

including but not limited to, an observation of a visible bulge in clothing, sudden movements or

repeated attempts to reach for an object not immediately visible, or the nature of the suspected

crime.  Ramirez v. City of Buena Park, 560 F.3d 1012, 1022 (9th Cir. 2009).  However, the

"'narrow scope' of the Terry exception does not permit a frisk for weapons on less than

reasonable belief or suspicion directed at the person to be frisked, even though that person

happens to be on the premises where an authorized . . . search is taking place." Ybarra v. Illinois,

444 U.S. 85, 94 (1979); Ramirez, 560 F.3d at 1022.  That is, "[p]ersons detained during a search

for evidence cannot be searched according to Ybarra simply because they are there." United

States v. Vaughan, 718 F.2d 332, 335 n.7 (1983); see Marks v. Clarke, 102 F.3d 1012, 1029 (9th

Cir. 1996).  "Unless an officer can point to specific facts that demonstrate reasonable suspicion

that the individual is armed and dangerous," then a Terry search or pat down is improper.

Ramirez, 560 F.3d at 1022.

### Discussion

There is no dispute that Dossey searched Nicholson's purse without a warrant.  Therefore,

the search was unreasonable unless there is an exception to the warrant requirement.  See Place,

462 U.S. at 701.

Dossey argues that he had probable cause to believe that contraband was in the purse.

However, assuming that Dossey had probable cause to believe that Nicholson was secreting

contraband in the purse, Dossey would have only been permitted to seize the purse, and he would

not have been permitted to search it.  See Place, 462 U.S. at 701.  In order to search the purse,

Dossey was required to obtain a search warrant after seizing the purse.  See id.  Since Dossey

failed to do this, probable cause for contraband does not justify the search.  See id.

Dossey also argues that he was concerned about officer safety and that Nicholson's purse

may have contained a weapon.  A *Terry* search or pat down may entail a search of a personal

container, such as a purse, if an officer has reasonable suspicion that a suspect is armed.[11]  See

Flippin, 924 F.2d at 166.  Dossey indicates that his concern over officer safety stemmed from

Miles's past narcotic and weapons charges, Miles was a known gang member, people who sell

illegal drugs are often armed to protect themselves and their drugs, and gang members and those

who sell drugs often hide drugs and weapons in the purses of women because they feel officers

are less likely to search a woman's purse.  See Doc. No. 51-1 at 11:17-14; Doc. No. 58 at 11:8-9.

This evidence is insufficient to establish reasonable suspicion because it is mainly directed at

Miles and not at Nicholson.  While Miles may have been a known gang member, there is no

evidence that Nicholson was actively involved in Miles's gang.  There is no evidence that

Miles's gang was known to use women or women's purses to hide weapons, or that Miles was

himself known to hide contraband or weapons in women's purses.[12]  Further, all prior criminal

offenses related to Miles, and there is no evidence tying Nicholson to those prior offenses.

Relatedly, there is no evidence that Miles was currently dealing drugs even though he was on

parole for a drug related offense.  It is true that Dossey had received a tip that Nicholson was

selling drugs at a local business.  However, the tip related to drug sales at a business, not at the

residence, and the tip did not mention Nicholson being armed.[13]  See PRDUMF 1.  Further, there

is no evidence that Dossey observed bulges in Nicholson's purse, and Nicholson was simply

wearing the purse when the officers arrived.  There is also no evidence that Miles made any

movements or gestures towards the purse.  Simply put, Dossey has failed to identify specific,

articulable facts that relate to Nicholson.  Because Dossey has not articulated a reasonable

---

[11]One of the requirements for a *Terry* frisk or search is that the suspect be lawfully detained.  See Orman, 486 F.3d at 1174; Flippin, 924 F.2d 165 n.2.  Because Nicholson was in the yard of the residence and resided with Miles at 3204 Cornell, Nicholson was lawfully detained during the parole search.  See Sanchez v. Canales, 574 F.3d 1169, 1173 (9th Cir. 2009) (holding that, pursuant to *Muehler v. Mena*, 544 U.S. 93 (2005), "officers may constitutionally detain the occupants of a home during a parole . . . compliance search.").

[12]There is also no evidence that Dossey knew that gang members hid weapons in women's purses.

[13]The Court notes that Dossey has not argued in this motion that he considered the tip regarding Nicholson selling drugs when he approached her and demanded the purse.  The Court includes this fact because it is based on Dossey's deposition testimony and Nicholson relies on it as part of her opposition.  See PRDUMF 1.

1    suspicion that Nicholson was armed, a *Terry* search of the purse was not appropriate.[14]   See

2    Ybarra, 444 U.S. at 94; Ramirez, 560 F.3d at 1022; Flippin, 924 F.2d at 166; Vaughan, 718 F.2d

3    at 335.

4              Finally, Dossey argues that Miles was subject to a parole search condition, there was

5    probable cause to believe that Miles had hidden either contraband or a weapon in Nicholson's

6    purse, and Nicholson had a reduced expectation of privacy because she lived with Miles.  In

7    essence, Dossey argues that the parole search condition on Miles extended to Nicholson and her

8    purse.  The Court is not convinced by this arguments.

9              First, the Court does not see probable cause or reasonable suspicion to believe that Miles

10   had placed anything in Nicholson's purse.[15]  It is true that Miles was subject to a parole search,

11   was a known gang member, and had previously been convicted of weapons and drug related

12   crimes.  It is also true that Dossey knew that people who sell drugs sometimes hide weapons in

13   purses.  However, other than these past events and generalizations, there is nothing to link Miles

14   to any current illegal activity or expressly to the purse.  Nicholson was wearing the purse when

15   the officers arrived.  There is no evidence that Miles reached for, handled, or otherwise made any

16   gestures relative to the purse.  There is also no evidence that Miles was known to hide drugs in

17   women's purses.  Dossey has not established probable cause or reasonable suspicion to believe

18   that Miles secreted contraband or weapons in Nicholson's purse.

19             Second, the only authority cited by Dossey in relation to this issue is in his reply brief.

20   Dossey cites *People v. Sanders*, 31 Cal.4th 381 (2003).  In *Sanders*, the California Supreme

21

22        [14]Even if reasonable suspicion existed to do a *Terry* protective search of the purse, there is no evidence
      regarding the nature of the purse, e.g. whether it was possible to feel weapons in the purse because of the thin and
23    flexible nature of the purse's construction.  Cf. Flippin, 924 F.2d at 165 (noting that officer was unable to determine
      through "plain feel" whether a weapon was inside a bag); Vaughan, 718 F.2d at 335 (noting that weapons could have
24    been felt through the briefcase which was thin and soft).  Further, the search described by Nicholson indicates an
      unreasonably executed search.  Instead of looking inside the purse, Dossey just dumped the entire contents of the
25    purse on the ground.  Such a search would appear to exceed the permissible scope of a *Terry* protective search.  See
      Vaughan, 718 F.2d at 335 ("A search which is reasonable at its inception may violate the Fourth Amendment by
26    virtue of its intolerable intensity and scope.") (quoting Terry, 392 U.S. at 18).

27        [15]"Probable cause to search exists when the known facts and circumstances are sufficient to warrant a
      reasonable person to conclude that contraband or evidence of a crime will be found."  United States v. Ibarra, 345
28    F.3d 711, 716 (9th Cir. 2003).  "The reasonable suspicion standard is a less demanding standard than probable cause
      . . . ."  Gallegos v. City of Los Angeles, 308 F.3d 987, 990 (9th Cir. 2002).

Court acknowledged that "Sanders had a reduced expectation of privacy because she was living with a parolee subject to a search condition . . . ." Sanders, 31 Cal.4th at 330.  However, the remainder of the quote is instructive: ". . . but she 'need not anticipate that officers with no knowledge of the probationer's existence or search condition may freely invade *their residence* in the absence of a warrant or exigent circumstances." Id. (quoting People v. Robles, 23 Cal.4th 789, 799 (2000)) (emphasis added).  Dossey is relying on a portion of a *Sanders* out of context. *Sanders* involved the search of an apartment, it did not involve the search of a person or a purse that was on the person.  *Sanders*, as well as the case it relied upon, *Robles*, stand for the proposition that people who cohabitate with those subject to a probation or parole search term have a reduced Fourth Amendment expectation of privacy in their shared residence.  See id.

Nevertheless, it has been recognized that when executing a parole or probation search, officers may look into closed containers that they reasonably believe are in the complete or joint control of the parolee/probationer.  See People v. Baker, 164 Cal.App.4th 1152, 1159 (2008) (citing People v. Woods, 21 Cal.4th 668, 682 (1999)); People v. Boyd, 224 Cal.App.3d 736, 749 (1990)); People v. Smith, 95 Cal.App.4th 912, 917-20 (2002); People v. Veronica, 107 Cal.App.3d 906, 909 (1980).  Accordingly, if the evidence shows that Miles had joint control of the purse with Nicholson, then the search of the purse would be proper.  See id.  However, Nicholson was wearing the purse when Dossey arrived.  There is no evidence that Miles utilized the purse, controlled the purse, made any movements towards the purse, or had any kind of ownership interest in the purse.  It appears obvious that the purse was Nicholson's.  Without any evidence that Dossey knew that Miles had at least joint control over the purse, the search of Nicholson's purse cannot be justified by Miles's parole condition.  See Baker, 164 Cal.App.4th at 1159-60; People v. Montoya, 114 Cal.App.3d 556, 562 (1981) ("[T]he reasonable expectation of privacy possessed by a nonparolee cannot be invaded through an overbroad parole search."); Veronica, 107 Cal.App.4th at 909.

Viewed in the light most favorable to Nicholson as the non-moving party, the evidence indicates that Dossey's search of Nicholson's purse violated the Fourth Amendment.

**III.      Fourth Amendment – Force Used To Obtain Nicholson's Purse**

*Defendant's Argument*[16]

Dossey argues that, at most, the force used constituted incidental contact when Nicholson refused to relinquish the purse.  Dossey needed to search the purse to ensure that there were no weapons that could be used against the officers at the scene.  While the force was incidental, it was reasonable under the circumstances and did not violate the Fourth Amendment.

*Plaintiffs' Response*

Nicholson does not expressly address this argument in the opposition other than to say that there are disputed issues with respect to the force used to obtain the purse.  However, Nicholson did cite and rely on deposition testimony that addressed the force used by Dossey.

*Legal Standard*

All claims that law enforcement officers used excessive force, either deadly or non-deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under the Fourth Amendment and its standard of objective reasonableness.  See Scott v. Harris, 550 U.S. 372, 381-83 (2007); Graham v. Connor, 490 U.S. 386, 395 (1989).  The pertinent question in excessive force cases is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation."  Graham, 490 U.S. at 397; Blankenhorn v. City of Orange, 485 F.3d 463, 477 (9th Cir. 2007).  The objective inquiry into reasonableness is highly fact specific.  See Scott, 550 U.S. at 383; Wilkinson v. Torres, 610 F.3d 546, 551 (9th Cir. 2010).  "We first assess the quantum of force used to arrest [the plaintiff]" and then "measure the governmental interests at stake by evaluating a range of factors."  Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007).  Factors that are considered in assessing the government interests at stake include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396;

---

[16]In the alternative, Dossey moves for qualified immunity  The Court will address qualified immunity in a separate section of the order.

1   Blankenhorn, 485 F.3d at 477; Davis, 478 F.3d at 1054.  Police officers "are not required to use

2   the least intrusive degree of force possible" as long as the force actually used was reasonable.

3   Forrester v. City of San Diego, 25 F.3d 804, 807 (9th Cir. 1994); see Gregory v. County of Maui,

4   523 F.3d 1103, 1107 (9th Cir. 2008).  Reasonableness "must be judged from the perspective of a

5   reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham, 490

6   U.S. at 396; Wilkinson, 610 F.3d at 550.  "Force is excessive when it is greater than is reasonable

7   under the circumstances."  Santos v. Gates, 287 F.3d 846, 854 (9th Cir. 2002).  When the

8   circumstances show that there is no need for force, any force used is constitutionally

9   unreasonable.  See Fontana v. Haskin, 262 F.3d 871, 880 (9th Cir. 2001); see also Motley v.

10  Parks, 432 F.3d 1072, 1089 (9th Cir. 2005).

11          *Discussion*

12          There is a dispute with respect to the seizure of Nicholson's purse.  Dossey declared, "I

13  then reached toward the purse and Ms. Nicholson slipped the strap down her arm, allowing me to

14  take possession of the purse."  Dossey Dec. ¶ 11.  In contrast, Nicholson testified that, while she

15  was sitting on the curb, and after she protested that the officers could not search her children,

16  Dossey "shoved me, like, knocked me back into the grass, to the mud, to my neighbor's yard,"

17  and then snatched the purse.  Nicholson Depo. 54:14-20.  Nicholson testified that Dossey used

18  his forearm to knock her back.  See id. at 55:1-4.  Because Nicholson is the non-moving party,

19  the Court will credit Nicholson's version of events.  See Stegall, 350 F.3d at 1065.

20          The quantum of force used is not easily determined.  The force was Dossey's use of his

21  forearm to shove or knock Nicholson down/over.  Nicholson was already sitting down, so she did

22  not fall a significant distance.  Nicholson does not contend that she was bruised or otherwise

23  physically injured by Dossey's forearm or from being knocked down.  Without anything more,

24  the Court can only conclude that the amount of force used by Dossey was minor.

25          In terms of the *Graham* factors, there was no crime at issue because a parole search of

26  Miles and his residence was occurring.  Nicholson was not evading or resisting arrest.  In fact,

27  she was not even being arrested at this time.  Nothing indicates that Nicholson posed an

28  immediate and imminent threat to the officers.  Nicholson was being lawfully detained in

1  connection with a parole search of the residence.  See Sanchez v. Canales, 574 F.3d 1169, 1173

2  (9th Cir. 2009).  Because the officers could detain Nicholson, they could also take reasonable

3  steps to ensure their safety during the parole search.  See  Muehler v. Mena, 544 U.S. 93, 100

4  (2005).  However, as discussed above, Dossey's arguments did not show specific and articulable

5  facts that created a reasonable suspicion that Nicholson was armed.

6        With these considerations in mind, and viewing the evidence in the light most favorable

7  to Nicholson, the Court concludes that the evidence rises above the level of a scintilla in support

8  of an excessive force claim.  Although the force used was minor and there appears to have been

9  no actual physical injury, it is not apparent that any force was justified in retrieving the purse.

10  Dossey knocked Nicholson back with his forearm and into the mud in order to obtain a purse to

11  which he did not even have reasonable suspicion to seize.  Because it is not apparent that any

12  force was justified, Dossey's use of his forearm appears to be excessive and in violation of the

13  Fourth Amendment.  See Fontana, 262 F.3d at 880.

14

15  **IV.    Qualified Immunity**

16        *Defendant's Argument*

17        Dossey argues that any constitutional violations concerning the purse or associated use of

18  force were "reasonable" under the circumstances.  Miles was on parole and the officers were

19  entitled to search him and has home.  There was also a concern that Nicholson's purse may have

20  harbored weapons that could have harmed the officers during the search.

21        *Plaintiff's Opposition*

22        Nicholson argues the relevant Fourth Amendment law was clearly established at the time

23  of the incident and thus, qualified immunity is not appropriate.

24        *Legal Standard*

25        Qualified immunity protects "government officials . . . from liability for civil damages

26  insofar as their conduct does not violate clearly established statutory or constitutional rights of

27  which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982);

28  Phillips v. Hust, 477 F.3d 1070, 1079 (9th Cir. 2007); Brittain v. Hansen, 451 F.3d 982, 987 (9th

1   Cir. 2006).  The "concern of the immunity inquiry is to acknowledge that reasonable mistakes

2   can be made," and that it is "often difficult for an officer to determine how the relevant legal

3   doctrine will apply to the factual situation that he faces."  Estate of Ford v. Ramirez-Palmer, 301

4   F.3d 1043, 1049 (9th Cir. 2002).

5          A court employs a tiered analysis for determining qualified immunity.  See Saucier v.

6   Katz, 533 U.S. 194, 200-02 (2001); Skoog v. County of Clackamas, 469 F.3d 1221, 1229 (9th

7   Cir. 2006); Brittain, 451 F.3d at 987.  However, lower courts need not strictly follow the tiered

8   sequence in analyzing qualified immunity, but instead may dispose of the issue at step two

9   without addressing step one.  Pearson v. Callahan, 129 S.Ct. 808, 821 (2009); Moss v. United

10  States Secret Service, 572 F.3d 962, 968 n.5 (9th Cir. 2009).  Under the first step, the court

11  determines whether, "taken in the light most favorable to the party asserting the injury, do the

12  facts show the officer's conduct violated a constitutional right?"  Saucier, 533 U.S. at 201;

13  Phillips, 477 F.3d at 1079; Skoog, 469 F.3d at 1229.  If the answer is "no," then the inquiry ends

14  and the plaintiff cannot prevail; if the answer is "yes," the court continues the analysis.  See

15  Saucier, 533 U.S. at 201; Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007);

16  Johnson v. County of L.A., 340 F.3d 787, 793-94 (9th Cir. 2003).

17         Under the second step, the court determines "whether the right was clearly established,"

18  and applies an "objective but fact-specific inquiry."  Inouye v. Kemna, 504 F.3d 705, 712 (9th

19  Cir. 2007); see Saucier, 533 U.S. at 202; Brittain, 451 F.3d at 988.  The critical question is

20  whether "the contours of the right were sufficiently clear that a reasonable official would

21  understand that what he is doing violates the right."  Saucier, 533 U.S. at 202; Phillips, 477 F.3d

22  at 1079.  Whether a right is clearly established must be "undertaken in light of the specific

23  context of the case, not as a broad general proposition."  Saucier, 533 U.S. at 201; Skoog, 469

24  F.3d at 1229-30.  In making this determination, the court considers the state of the law at the time

25  of the alleged violation, but it is unnecessary for the precise conduct in question to have been

26  previously held unlawful.  See Inouye, 504 F.3d at 712; Devereaux v. Perez, 218 F.3d 1045,

27  1052 (9th Cir. 2000).  Further, the court considers the "information possessed" by the officer at

28  the time of his conduct.  See Hunter v. Bryant, 502 U.S. 224, 227 (1991); Anderson v. Creighton,

1  483 U.S. 635, 641 (1987); Edgerly v. City & County of San Francisco, 495 F.3d 645, 654 (9th

2  Cir. 2007).  If the officer could have reasonably, but mistakenly, believed that his conduct did not

3  violate a clearly established constitutional right, then the officer will receive qualified immunity.

4  See Saucier, 533 U.S. at 205-06; Skoog, 469 F.3d at 1229; Johnson, 340 F.3d at 794; Jackson v.

5  City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001).  As a wholly objective inquiry, see

6  Brittain, 451 F.3d at 988, the "'subjective beliefs' of the actual officer are . . .irrelevant." Inouye,

7  504 F.3d at 712; see Anderson, 483 U.S. at 641.  Thus, qualified immunity applies "if 'a

8  reasonable officer could have believed [the action] to be lawful, in light of clearly established law

9  and the information the . . . officer[] possessed.'"  Lawrence v. United States, 340 F.3d 952, 956-

10  957 (9th Cir. 2003); see also Hunter, 502 U.S. at 227.

11      *Discussion*

12      With respect to the search of Nicholson's purse, Dossey relied on *People v. Sanders* and

13  the consequences that flow from a person living with a parolee who is subject to a search

14  condition.  That is, Dossey relied on California case authority.  Conspicuously absent from

15  Dossey's briefing were any cases that involved the search of a non-parolee or a non-parolee's

16  purse/personal property.  As indicated above, California courts prior to June 2008 had established

17  that, in order to search a container that belonged to someone who lived with a parolee, the officer

18  must reasonably believe that the parolee had at least joint control of the container.  See Veronica,

19  107 Cal.App.3d at 909; see also Baker, 164 Cal.App.4th at 1159 (discussing pre-2008 cases).  A

20  reasonable officer in Dossey's position would have been aware of this law.  As applied to the

21  facts of the case, Dossey had no information that Miles had joint control over Nicholson's purse.

22  Dossey knew that Miles was on parole for a drug related offense and was a known member of a

23  street gang.  However, as discussed above, there is no evidence that Miles was known to hide

24  drugs in women's purses, that he had made any movement towards the purse, or that he had any

25  ownership interest in the purse.  Purses are generally associated with women, and Nicholson was

26  wearing the purse when the officers arrived and approached.

27      Similarly, the law was established as early as 1979 that particularized suspicion as to the

28  specific individual was necessary in order to conduct protective *Terry* frisks or searches of

1    personal items such as purses.  See Ybarra, 444 U.S. at 94; Flippin, 924 F.2d at 166; Vaughan,

2    718 F.2d at 335.  As discussed above, Dossey's arguments are focused almost entirely on Miles.

3    There is insufficient evidence regarding current criminal behavior by Miles, or evidence that

4    affirmatively linked Miles to the purse, or, importantly, evidence regarding Nicholson and her

5    purse.  The evidence presented does not sufficiently create any reasonable suspicion that

6    Nicholson was armed or was secreting a weapon in her purse.  Because the law regarding

7    searches of personal property was established well before 2008, a reasonable officer in Dossey's

8    position would have known that the search of the purse was unlawful.  Accordingly, qualified

9    immunity for Dossey's search of the purse cannot be granted.

10          With respect to the force used to obtain the purse, there was no crime at issue, Nicholson

11   posed no immediate or imminent threat, and she was not resisting arrest.  Further, there was no

12   evidence presented that reasonably indicated that Nicholson had a weapon.  When the officers

13   approached, Nicholson was simply a woman with a purse.  Dossey has not sufficiently articulated

14   facts that would justify the seizure of the purse for the safety of the officers while they were

15   conducting a parole search of Miles and his residence.  While the amount of force used appeared

16   to be minor, the evidence as argued and presented does not indicate that any use of force was

17   appropriate.  It was established prior to 2008 that, when the circumstances show that there is no

18   need for force, any force used is constitutionally unreasonable.  See Fontana, 262 F.3d at 880.

19   Because the law on the use of force was established well before 2008, a reasonable officer in

20   Dossey's position would have known that the use of force to obtain the purse was unlawful.

21   Accordingly, qualified immunity for Dossey's use of force to obtain Nicholson's purse cannot be

22   granted.

23          Summary judgment on the basis of qualified immunity Nicholson's Fourth Amendment

24   claims regarding the use of force and the search of her purse will be denied.[17]

25   ───────────────

26          [17]Dossey declared that, when Nicholson saw the officers approach, she reached into the bed of the pick-up
     truck, grabbed the purse, and slung it over her shoulder.  See DUMF 10.  If it is later determined that Nicholson

27   grabbed the purse from the truck as she saw the officers approaching, this fact could possibly (but not necessarily)
     impact the availability of qualified immunity.  Cf. Flippin, 924 F.2d at 166-67.  However, because there is a material

28   factual dispute as to whether Nicholson grabbed the purse or was already wearing it, qualified immunity cannot be
     granted at this time.  See Hopkins v. Bonvincino, 573 F.3d 752, 763 (9th Cir. 2009); Torres v. City of Los Angeles,
     548 F.3d 1197, 1210-11 (9th Cir. 2008); Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993).

**V.**     **Fourth Amendment – Body Searches**

*Defendants' Argument*

Defendants argue that R.S.W. has not identified any of them as the male officer who performed his strip search.  Further, the strip searches of Nicholson, Williams, and C.W. were performed by a female officer, but none of the named Defendants are female.  Additionally, in reply, Dossey and Pflugh argue that they have no liability as supervisors.  The evidence at best shows that Pflugh called Martinez to conduct a pat-down search, and Dossey told Martinez who was to be patted down.  There is no evidence that Pflugh or Dossey knew that a strip search was going to occur.

*Plaintiffs' Opposition*

Plaintiffs argue that Pflugh and Dossey are liable for the strip searches.   Pflugh radioed for a female officer to come the residence, and Dossey told Nicholson that a female officer was coming to search her and the children.  Pflugh, who had the authority to order strip searches, saw Martinez take Nicholson inside the residence.  Martinez took her instructions from Dossey, whom she believed was the officer in charge.  The fact that the officers went to the effort to conduct the searches individually and in private contradicts the notion that the searches were only to be "pat down" searches.  This evidence, together with the specific recollections of the Plaintiffs regarding the strip searches, create triable issues of fact.

*Legal Standard*

a.     Supervisor Liability

Generally, under 42 U.S.C. § 1983, "supervisory officials are not liable for actions of subordinates on any theory of vicarious liability."  Jeffers v. Gomez, 267 F.3d 895, 915 (9th Cir. 2001).  Instead, "[s]upervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others."  Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009); Menotti v. City of Seattle, 409 F.3d 1113, 1149 (9th Cir. 2005).  Accordingly, "a supervisor is liable for the acts of his subordinates if the

22

1   supervisor participated in or directed the violations, or knew of the violations of subordinates and

2   failed to act to prevent them." Corales, 567 F.3d at 570; Preschooler II v. Clark County Sch. Bd.

3   of Trustees, 479 F.3d 1175, 1182 (9th Cir. 2007). The requisite causal connection between a

4   supervisor and a plaintiff's injury "may be established when [the supervisor] sets in motion a

5   series of acts by others which the [supervisor] knows or reasonably should know would cause

6   others to inflict constitutional harms." Corales, 567 F.3d at 570; Preschooler II, 479 F.3d at

7   1183.

8          b.      "Strip Searches"

9          Generally, the constitutionality of a search is assessed by balancing "the need for the

10  particular search against the invasion of personal rights that the search entails," which in turn

11  requires the weighing of "the scope of the particular intrusion, the manner in which it is

12  conducted, the justification for initiating it, and the place in which it is conducted." Way v.

13  County of Ventura, 445 F.3d 1157, 1160 (9th Cir. 2006). Outside of the context of a prison,

14  police officers may conduct strip and cavity searches of an arrestee if the search is supported by

15  probable cause and the officer has obtained a search warrant. See Fuller v. M.G. Jewelry, Inc.,

16  950 F.2d 1437, 1449-50 (9th Cir. 1991); see also Fuller v. M.G. Jewelry, 950 F.2d 1437, 1454

17  (9th Cir. 1991) (Hall, J., concurring). A police officer may perform a strip or cavity search of an

18  arrestee in the absence of a warrant if there is probable cause combined with exigent

19  circumstances. See Fuller, 950 F.2d at 1449-50; see also Fuller, 950 F.2d at 1454 (Hall, J.,

20  concurring).

21         *Discussion*

22          As indicated above, the deposition testimony of Nicholson, Williams, C.W., and R.S.W.

23  reveal highly intrusive searches that involved the removal of clothing (sometimes completely

24  removed), visual inspection of the body, and in some instances the physical touching of highly

25  intimate regions of the body. Neither Williams, nor C.W., nor R.S.W. were under arrest, there

26  was no warrant that applied to these individuals, there was no probable cause of any kind as to

27  these individuals, and there was no exigent circumstances associated with these individuals.

28  There is no justification apparent for a strip or cavity search of these plaintiffs. Similarly,

assuming that Nicholson was under arrest, there was no warrant obtained, there was not probable

cause to believe that she was secreting contraband within her body, and there were no exigent

circumstances.  In short, the Plaintiffs' individual depositions show a violation of their Fourth

Amendment rights.  See Fuller, 950 F.2d at 1449-50; see also Fuller, 950 F.2d at 1454 (Hall, J.,

concurring); cf. Doe v. City of Chicago, 580 F.Supp. 146, 148-51 (N.D. Ill. 1983).

Dossey and Pflugh are correct that they did not actually search the Plaintiffs.  However,

that these Defendants did not actually conduct the searches does not end the inquiry.

With respect to Dossey, he was the case agent in charge of the operation and was

responsible for establishing protocols for the search and assigning the other officers various tasks

during/at the search.  See PUMF 2.  Martinez correctly believed that Dossey was "in charge," and

she took her orders from Dossey.  See Martinez Depo. 24:1-6.  Dossey told Nicholson that a

female officer would be arriving and that everyone, including the children, would be searched.

See Nicholson Deposition 54:1-12.  Martinez testified that Dossey told her to search the

Plaintiffs.  See Martinez Depo. 29:13-18.  Further, while Nicholson was protesting the strip

search, Martinez told Nicholson that she (Martinez) was called to do a search, that everyone was

being searched, and that she was doing what she had been called out to do.  See Nicholson Depo.

75:20-76:1.  In other words, Martinez told Nicholson that she was simply following orders.  It is

true that Martinez testified that she was told to do a "pat down search."  See Martinez Depo.

29:13-18.  However, Martinez's recollection of the searches was admittedly not extensive, and a

search limited to a "pat down" is inconsistent with what Martinez told Nicholson.  Moreover,

Martinez took each of the Plaintiffs inside the house and into the bathroom to conduct the

searches.  Plaintiffs' argument that such conduct is seemingly inconsistent with a mere pat down

search is persuasive.  Taking the Plaintiffs inside the house, and then inside the bathroom, is

conduct that is designed to shield the searches and the Plaintiffs from the sight of other officers

and passers by.  It is conduct that is consistent with an attempt to address the privacy concerns

associated with a strip or cavity search.  It is not conduct that is necessarily consistent with

patting down the exterior of clothes.  See Byrd v. Maricopa County Sheriff's Dept., 629 F.3d

1135, 1142 (9th Cir. 2010) (en banc) ("[W]e defined pat-down searches as searches 'done briefly

and while the [individuals] are fully clothed, and thus do not involve intimate contact with the [individuals'] bodies.'").  A pat down search can easily be accomplished in front of other persons without implicating the type of privacy concerns associated with a strip or cavity search.  E.g. Terry, 392 U.S.  at 6-7 (officer patted down Terry on a public sidewalk near a business).[18]

In light of the above evidence, because Martinez received her orders from Dossey, and Dossey had told Nicholson that a female officer was coming to search all the Plaintiffs, a reasonable jury could conclude that Dossey ordered the strip or cavity searches.  The evidence is sufficient to indicate that Dossey has supervisory liability for they bodily searches of Plaintiffs.  See Corales, 567 F.3d at 570.  Summary judgment in favor of Dossey on the strip search claims is not appropriate.

With respect to Pflugh, he had the authority to order strip searches, but such an order was required to be in writing.  See Pflugh Depo. at 35:18-23.  Pflugh denied that he directed Martinez to search Nicholson.  See id. at 35:6-8.  Pflugh testified that he saw Martinez lead Nicholson into the house, and he believed that Martinez was going to search Nicholson.  See Pflugh Depo. at 35:9-17.  Finally, Martinez testified that radio logs indicated that a sergeant had requested her presence at the residence.  Since Pflugh was the only sergeant present, it is not an unreasonable inference that Pflugh had radioed for a female officer.

The link between Pflugh and the strip searches is not as strong as the link with Dossey.  However, the Court believes that the evidence of Pflugh's liability as a supervisor just rises above that of a scintilla with respect to Nicholson.  Pflugh appears to have radioed for Martinez and saw Martinez lead Nicholson inside the home in order to conduct a search of Nicholson.  Without further evidence presented, it is unknown why Nicholson would need to be taken inside the house in order for a pat down search to be performed.  Viewed in the light most favorable to Plaintiffs, a reasonable jury could conclude that, since Pflugh summoned Martinez and believed that Martinez led Nicholson inside in order to search Nicholson, Pflugh knew that more than a

---

[18]The Court is not downplaying the intrusiveness of a pat down search.  A pat down search may involve feeling around the groin and genital areas of an individual.  See Terry 392 U.S. at 17 n.13.  Nevertheless, a pat down search is a search of a clothed individual, and is not a search of either a naked or nearly naked individual.  See Byrd, 629 F.3d at 1142.

mere pat down search was going to occur.  Pflugh's acquiescence in the unconstitutional search

of Nicholson is sufficient to impose liability for Nicholson's strip search of Nicholson.  See

Corales, 567 F.3d at 570.

The Court cannot, however, reach the same conclusion as to the searches of Williams,

C.W., and R.S.W.  A key piece of evidence that linked Pflugh to Nicholson's search was

Pflugh's admission that he saw Martinez lead Nicholson into the house in order to search her.

There is no evidence that similarly links Pflugh to Williams, C.W., and R.S.W.  For example,

there is no evidence that Pflugh expressly knew or presumed that Williams, C.W., and R.S.W.

would be searched, and there is no evidence that Pflugh saw Williams, C.W., and R.S.W. go into

the house with Martinez.  In fact, the only evidence before the Court is that Pflugh merely saw

Williams, C.W., and R.S.W. standing outside the house near another officer.  Without more of a

link between Pflugh and the searches of Williams, C.W., and R.S.W., the evidence of

supervisory liability against Pflugh as to these three Plaintiffs is "merely colorable," and thus

insufficient.  See Hardage, 427 F.3d at 1183.  Summary judgment in favor of Pflugh with respect

to the strip searches of Williams, C.W., and R.S.W. is appropriate.

## VI.   _Monell_ **Liability**

### _Defendant's Argument_

The City argues that Plaintiffs have no evidence of either a widespread custom or

practice.  Plaintiffs have not identified any witnesses in their Rule 26 disclosures that have been

subject to similar incidents.  Accordingly, there is no basis for municipal liability.

### _Plaintiffs' Opposition_

Plaintiffs argue that in 2002, this Court admonished the City and its officers that

conducting strip searches in public violated the Fourth Amendment.  In _Johnson v. City of_

_Bakersfield_, 1:01-cv-5870 DLB (E.D. Cal. Aug. 2, 2002), the Court found that strip searching a

parolee in public was unreasonable.  Although the strip searches in this case were done in the

bathroom of the residence, they still violated the constitution.  Further, the evidence indicates that

supervisory liability for the strip searches is available as to Dossey and Pflugh, and Martinez

26

1  performed the searches on three individuals, including children.

2      *Legal Standard*

3      Municipalities are considered "persons" under 42 U.S.C. § 1983 and therefore may be

4  liable for causing a constitutional deprivation.  Monell v. Department of Soc. Servs., 436 U.S.

5  658, 690 (1978); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).  A

6  municipality, however, "cannot be held liable solely because it employs a tortfeasor – or, in other

7  words, a municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat*

8  *superior* theory."  Monell, 436 U.S. at 691; see Long, 442 F.3d at 1185; Ulrich v. City & County

9  of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002).  Liability only attaches where the

10 municipality itself causes the constitutional violation through "execution of a government's

11 policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be

12 said to represent official policy."  Monell, 436 U.S. at 694; Ulrich, 308 F.3d at 984.  Municipal

13 liability may be premised on: (1) conduct pursuant to an expressly adopted official policy; (2) a

14 longstanding practice or custom which constitutes the 'standard operating procedure' of the local

15 government entity; (3) a decision of a decision-making official who was, as a matter of state law,

16 a final policymaking authority whose edicts or acts may fairly be said to represent official policy

17 in the area of decision; or (4) an official with final policymaking authority either delegating that

18 authority to, or ratifying the decision of, a subordinate.  See Price v. Sery, 513 F.3d 962, 966 (9th

19 Cir. Or. 2008); Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004); Ulrich, 308 F.3d at 984-85;

20 Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1995).  A "policy" is a deliberate choice to follow a

21 course of action . . . made from among various alternatives by the official or officials responsible

22 for establishing final policy with respect to the subject matter in question."  Fogel v. Collins, 531

23 F.3d 824, 834 (9th Cir. 2008); Long, 442 F.3d at 1185.  A "custom" for purposes of municipal

24 liability is a widespread practice that, although not authorized by written law or express

25 municipal policy, is so permanent and well-settled as to constitute a custom or usage with the

26 force of law."  St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); Los Angeles Police Protective

27 League v. Gates, 907 F.2d 879, 890 (9th Cir. 1990); see also Bouman v. Block, 940 F.2d 1211,

28 231-32 (9th Cir. 1991).  Stated differently, a custom is a widespread and longstanding practice

27

that "constitutes the standard operating procedure of the local government entity." Trevino, 99 F.3d at 918; Gillette v. Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino, 99 F.3d at 918; see also McDade v. West, 223 F.3d 1135, 1141 (9th Cir. 2000); Thompson v. Los Angeles, 885 F.2d 1439, 1443-44 (9th Cir. 1989). After proving one of the above theories of liability, the plaintiff must show that challenged municipal conduct was both the cause in fact and the proximate cause of the constitutional deprivation. See Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008); Trevino, 99 F.3d at 918.

*Discussion*

Plaintiffs have not provided sufficient evidence of a formal policy or a widespread custom or a widespread practice. It is true that in *Johnson* this Court found a violation of the Fourth Amendment due to the public strip searching of a parolee. See Court's Docket Doc. No. 56 at p. 9 ¶ 15. However, the events in *Johnson* occurred in March 2001. See id. at p. 2 ¶ 1. In contrast, the searches in this case occurred in June 2008, more than seven years after *Johnson*. Two incidents involving strip searches over a span of seven years is too sporadic and insufficient in frequency and duration to be considered a custom or practice. See Trevino, 99 F.3d at 918.

Further, Plaintiffs reliance on the acts of Dossey, Pflugh and Martinez is unclear. Other than *Johnson*, Plaintiffs cite no cases or authority with respect to *Monell* liability,[19] and they do not formulate a concrete argument regarding how these officers' involvement in this case creates *Monell* liability. Without a properly developed argument from Plaintiffs, this case seems to be an isolated incident involving lower level police officers. "[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable." City of Canton v. Harris, 489 U.S. 378, 391 (1989); see also Case v. Kitsap County Sheriff's Dep't, 249 F.3d 921, 931-32 (9th Cir. 2001) (". .

---

[19]*Johnson*'s discussion of *Monell* liability is very short and found that there was no *Monell* liability. See Doc. No. 56 at p. 10 ¶¶ 21-22.

28

. nor can liability be predicated on the isolated sporadic events in this case."); McDade, 223 F.3d at 1141.

Plaintiffs have failed to adequately established any practice, custom, or policy for purposes of *Monell* liability. Accordingly, summary judgment on Plaintiffs' *Monell* claim is appropriate.

**VII.   State Law Assault and Battery**[20]

*Defendants' Argument*

Defendants argue that the assault and battery claims must be proven as to each officer individually and that the officers cannot be liable for one another's conduct. With respect to C.W., she claims to have been strip searched by a female officer. However, none of the defendants are female. Similarly, R.S.W. has not identified any of the named male officers as the officer who strip searched him. Further, C.W. and R.S.W. were not touched by any of the officers. Since none of the defendants stip searched C.W. and R.S.W., there is no liability.

*Plaintiffs' Opposition*

Plaintiffs do not expressly address this argument.

*Legal Standard*

The elements of a civil battery under California law are: (1) the defendant intentionally performed an act that resulted in a harmful or offensive contact with the plaintiff's person; (2) the plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused injury, damage, loss or harm to the plaintiff.  See Brown v. Ransweiler, 171 Cal.App.4th 516, 526 -27 (2009); Fluharty v. Fluharty, 59 Cal.App.4th 484, 497 (2004).  "A bodily contact is offensive if it offends a reasonable sense of personal dignity."  See Judicial Council of Cal., Civil Jury Instructions ("CACI"), Comment to § 1300 (Fall 2011).

A civil assault is a "demonstration of an unlawful intent by one person to inflict immediate injury on the person of another then present."  Steel v. City of San Diego, 726

---

[20]The Court reiterates that only C.W. and R.S.W. have brought state law claims.  Nicholson and Williams have brought only 42 U.S.C. § 1983 claims.

F.Supp.2d 1172, 1189 (S.D. Cal. 2010); see Lowry v. Standard Oil Co., 63 Cal.App.2d 1, 6-7 (1944).  Thus, the tort of assault is based on a person's belief that he is about to be touched in an offensive manner by another.  See CACI § 1301.  Tortious assault "recognizes the right of the individual to peace of mind, to live without fear of personal harm."  Thing v. La Chusa, 48 Cal.3d 644, 649 (1989).  "The tort of assault is complete when the anticipation of harm occurs." Steel, 726 F.Supp.2d at 1189; Kiseskey v. Carpenters' Trust for So. Cal., 144 Cal.App.3d 222, 232 (1983).  "Mere words, however threatening, will not amount to an assault."  Steel, 726 F.Supp.2d at 1189.

   *Discussion*

        C.W. and R.S.W. do not challenge Defendants' characterization that their battery and assault claims are based on the strip searches.  As described above, however, C.W. and R.S.W.'s depositions show that no officer touched C.W. or R.S.W. during the strip searches.  See C.W. Depo. 49:25-50:12; R.S.W. Depo. 41:14-15.  Without a harmful or offensive touching of the person, there is no battery.  See Brown, 171 Cal.App.4th at 526-27; Fluharty, 59 Cal.App.4th at 497.  Because neither C.W. nor R.S.W. were physically touched in a harmful or offensive manner during the strip searches, they were not battered.  Summary judgment on the battery claims is appropriate.

        With respect to the assault claims, C.W. and R.S.W. testified that they were taken into the house and into the bathroom, they were then allowed to use the bathroom, they were told to take off their clothes, they were told to spin around, and they were then told to get dressed.  See C.W. Depo. 47:21-51:20; R.S.W. Depo. 38:16-43:1.  The testimony indicates that the male and female officers kept a distance, did not say anything that reasonably can be construed as a threat to touch, and simply observed C.W. and R.S.W. as they turned in a circle.  Given the nature of the officers' words and conduct, the evidence does not support a reasonable inference of either an intent to touch or a threat to touch.  See CACI § 1301.  Without either the threat of or intent to cause a harmful or offensive touching, there can be no civil assault.  See CACI § 1301; see also Steel, 726 F.Supp.2d at 1189; Lowry, 63 Cal.App.2d at 6-7.   Summary judgment on this claim is appropriate.

# VIII.   State Law False Imprisonment

*Defendants' Argument*

Defendants argue that summary judgment is appropriate because there is no evidence that C.W. and R.S.W. were unlawfully detained at any point.

*Plaintiffs' Opposition*

Plaintiffs do not expressly address this argument.

*Legal Standard*

Under California law, the elements of a claim for false imprisonment are: (1) the nonconsensual, intentional confinement of a person; (2) without lawful privilege; and (3) for an appreciable period of time, however brief.  Young v. County of Los Angeles, 655 F.3d 1156, 1169 (2011); Lyons v. Fire Ins. Exchange, 161 Cal.App.4th 880, 888 (2008).  In California, police officers are not liable for false arrest or false imprisonment when an arrest is either lawful or the officer had reasonable cause to believe that the arrest was lawful.  O'Toole v. Superior Court, 140 Cal.App.4th 488, 510-11 (2009).

*Discussion*

As stated above, the Ninth Circuit has held that, pursuant to *Muehler v. Mena*, 544 U.S. 93 (2005), "officers may constitutionally detain the occupants of a home during a parole . . . compliance search."  Sanchez v. Canales, 574 F.3d 1169, 1173 (9th Cir. 2009).  C.W. and R.S.W. lived with Miles and were present at 3204 Cornell when the officers arrived.  The officers were lawfully permitted to detain C.W. and R.S.W. during the search of the residence.  See id.  That is, any detention of C.W. and R.S.W. during the search was privileged.  Without an express argument from Plaintiffs that defends or addresses this cause of action, the Court can only conclude that any detention of C.W. and R.S.W. during the search of 3204 Cornell was lawful.  See Sanchez, 574 F.3d at 1173.  Summary judgment on this cause of action is appropriate.  See Young, 655 F.3d at 1169; Sanchez, 574 F.3d at 1173; O'Toole, 140 Cal.App.4th at 510-11.

**IX.      Intentional Infliction of Emotional Distress**

*Defendants' Argument*

Defendants argue that there is no evidence that any of them searched C.W. or R.S.W. Because a woman and an unknown man searched C.W. and R.S.W., there is no liability.

*Plaintiffs' Opposition*

Plaintiffs do not expressly address this cause of action.

*Legal Standard*

The elements of the tort of intentional infliction of emotional distress ("IIED") are: (1) extreme and outrageous conduct by the defendant; (2) the defendant's intention of causing, or reckless disregard of the probability of causing, emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. Hughes v. Pair, 46 Cal.4th 1035, 1050 (2009); Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 1001 (1993). Conduct is "extreme and outrageous" when it is "so extreme as to exceed all bounds of that usually tolerated in a civilized community." Hughes, 46 Cal.4th at 1050; Potter, 6 Cal.4th at 1001.

*Discussion*

The only two individual Defendants whom Plaintiffs contend should not be dismissed entirely from this case are Dossey and Pflugh. Obviously, neither Dossey nor Pflugh conducted the strip searches of C.W. and R.S.W. Under California law, "a public employee is not liable for an injury caused by the act or omission of another person." Cal. Gov. Code § 820.8. However, a public employee is not exonerated by § 820.8 "from liability for injury proximately caused by his own negligent or wrongful act or omission." Id.; Catsouras v. Department of Cal. Highway Patrol, 181 Cal.App.4th 856, 867 (2011); Guzman v. County of Monterey, 178 Cal.App.4th 983, 997 (2010). Thus, a public employee supervisor may be liable for the acts of a subordinate if that supervisor directs the subordinate to perform a wrongful act. See Mitchell v. City of Rohnert Park, 2010 U.S. Dist. LEXIS 13109, *8 (N.D. Cal. Feb. 16, 2010); Payne v. Bennion, 178 Cal.App.2d 595, 598-99 (1960); Wolfsen v. Wheller, 130 Cal.App. 475, 482 (1933).

As discussed above, the evidence is sufficient to enable a reasonable jury to conclude

that, as the case agent in charge, Dossey actually ordered Martinez to strip search C.W. and

R.S.W.  Because the evidence may be viewed as showing improper conduct by Dossey, he may

be held liable for his direction of the strip searches.[21]  See Mitchell, 2010 U.S. Dist. LEXIS

13109 at *8; Payne, 178 Cal.App.2d at 598-99; Wolfsen, 130 Cal.App. at 482.  Summary

judgment on this claim with respect to Dossey is not appropriate.

With respect to Pflugh, as discussed above, there is an insufficient basis for supervisor

liability as to the strip searches of C.W. and R.S.W.  Unlike Dossey, there is not a sufficient link

between Pflugh and the strip searches of C.W. and R.S.W.  Because there is insufficient evidence

linking Pflugh with the strip searches of C.W. and R.S.W., and because Pflugh did not actually

conduct the strip searches which form the basis of C.W. and R.S.W.'s IIED claim, summary

judgment in favor of Pflugh is appropriate.

Finally, the City is named as a Defendant.  Defendants have argued with respect to the

other state law claims that, because none of the named Defendants can be held liable, the City is

not liable under California Government Code § 815.2.  In relevant part, that section reads: "A

public entity is liable for injury proximately caused by an act or omission of an employee of the

public entity within the scope of his employment if the act or omission would, apart from this

section, have given rise to a cause of action against that employee . . . ."  Cal. Gov. Code §

815.2(a).  Dossey's directions to Martinez to conduct the searches appear to be within the course

and scope of his job duties as the case agent at the scene.  See PUMF 2; DUMF 39.  Since it

appears that Dossey's conduct was within the course and scope of his employment, the City

could be liable for Dossey's conduct.[22]  See Cal. Gov. Code § 815.2(a).  Accordingly, summary

judgment in favor of the City on this claim is not appropriate.

---

[21]Defendants contend that the frustration, embarrassment, and humiliation associated with a search by a police officer does not amount to intentional infliction of emotional distress.  The Court agrees with this proposition in the abstract.  However, this is not a typical case.  There can be no serious argument that the wrongful strip search of a minor that is not even based on reasonable suspicion is extreme and outrageous conduct.  E.g. New Jersey v. T.L.O., 469 U.S. 325, 382 n.25 (1985) (Stephens, J., concurring) ("It does not require a constitutional scholar to conclude that a nude search of a 13-year-old child is an invasion of constitutional rights of some magnitude.").

[22]Martinez (who is not a named defendant) is a City of Bakersfield police officer.  The motion for summary judgment did not discuss any potential liability of the City under Government Code § 815.2(a) for the conduct of Martinez.  Accordingly, for purposes of this motion, the Court limits its discussion of liability under § 815.2(a) to the conduct of Dossey.

1

**CONCLUSION**

2      Defendants move for summary judgment on all claims alleged against them.  Because

3 Plaintiffs agree that all individual officers except for Dossey and Pflugh may be dismissed,

4 summary judgment in favor of those seven other officers is appropriate.

5      With respect to the search of Nicholson's purse and the force used to obtain the purse,

6 Dossey was the only officer involved.  There was not probable cause or reasonable suspicion to

7 search the purse, and there was insufficient evidence that Miles exercised at least joint control

8 over the purse.  Further, since there was no justification to search the purse, Dossey was not

9 justified in using any amount of force to obtain the purse.  Viewing the evidence in the light most

10 favorable to Nicholson, a jury could conclude that the search of the purse and the force used to

11 obtain the purse violated the Fourth Amendment.  Further, the law was sufficiently clear as of

12 June 2008 that a reasonable officer would have known that Dossey's conduct was unlawful.

13 Accordingly, summary judgment on these Fourth Amendment claims is inappropriate.

14      With respect to the Fourth Amendment claims based on the strip searches, viewing the

15 evidence in the light most favorable to Nicholson, a reasonable jury could conclude that Dossey

16 ordered all of the strip searches.  A reasonable jury could also conclude that Pflugh acquiesced in

17 the strip search of Nicholson.  However, there is insufficient evidence to link Pflugh to the strip

18 searches of Williams, C.W., and R.S.W.  Accordingly, summary judgment on this claim with

19 respect to Dossey will be denied, summary judgment with respect to Pflugh as to Nicholson's

20 claim will be denied, but summary judgment with respect to Pflugh as to Williams, C.W., and

21 R.S.W.'s claims will be granted.

22      As to *Monell* liability, summary judgment is appropriate because Plaintiffs have not

23 provided sufficient evidence that the constitutional violations were caused by a practice, policy,

24 or custom of the City.

25      As to C.W. and R.S.W.'s assault and battery claims, summary judgment is appropriate

26 because C.W. and R.S.W. were not physically touched during the strip searches, and the evidence

27 does not indicate either the intent to offensively touch or the threatening of an offensive touch.

28      As to C.W. and R.S.W.'s false imprisonment claims, summary judgement is appropriate

because the officers could lawfully detain all the residents of 3204 Cornell who were present during the parole search.

As to C.W. and R.S.W.'s IIED claim, summary judgment in favor of Pflugh is appropriate because there is an insufficient link between Pflugh and the strip searches of C.W. and R.S.W.  Summary judgment with respect Dossey is inappropriate because the evidence indicates that he ordered the strip searches.  Finally, summary judgment with respect to the City is inappropriate because it appears that the City could be liable for Dossey's conduct pursuant to Government Code § 815.2(a).


Accordingly, IT IS HEREBY ORDERED that:

1.   Defendants' Ryan Slayton, Kyle Ursery, Joseph Cooley, Jeffrey Martin, Ronnie Dulan, Joshua Finney, and Scott Tunicliffe's motion for summary judgment is GRANTED;

2.   Defendants' motion for summary judgment on C.W. and R.S.W.'s claims for assault and battery and false imprisonment is GRANTED;

3.   Defendant Pflugh's motion for summary judgment on C.W. and R.S.W.'s intentional infliction of emotional distress claims, and on Williams, C.W., and R.S.W.'s Fourth Amendment strip search claims, is GRANTED;

4.   Defendant Pflugh's motion for summary judgment with respect to Nicholson's Fourth Amendment strip search claim is DENIED;

5.   Defendant City's motion for summary judgment with respect to Plaintiffs' *Monell* claims is GRANTED;

6.   Defendant City's motion for summary judgment with respect to C.W. and R.S.W.'s intentional infliction of emotional distress claim is DENIED; and

7.   Defendant Dossey's motion for summary judgment on all Fourth Amendment claims, and on C.W. and R.S.W.'s  intentional infliction of emotional distress claim, is DENIED.

IT IS SO ORDERED.

Dated:   December 19, 2011                          _____

                                                   CHIEF UNITED STATES DISTRICT JUDGE